IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **JEFF FERRELL,** | Case Number 1:14 CV 1245 |
| Plaintiff, | |
| v. | Magistrate Judge James R. Knepp, II |
| **COMMISSIONER OF SOCIAL SECURITY,** | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

### INTRODUCTION

Plaintiff Jeff Ferrell seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 14). For the reasons stated below, the Commissioner's decision is remanded in part and affirmed in part.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for SSI and DIB on December 13, 2010, alleging disability beginning on November 24, 2010. (Tr. 1065-79). Both applications were denied initially and on reconsideration. (Tr. 1007-13, 1019-28). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 1033). After a hearing where Plaintiff (represented by counsel) and a vocational expert testified, the ALJ denied Plaintiff's claims. (Tr. 796-815). On May 1, 2014, the Appeals Council denied Plaintiff's request for review, making the hearing

decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On June 10, 2014, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Vocational History and Personal Background*

Born May 9, 1964, Plaintiff was 46 years old as of the alleged disability onset date. (Tr. 1065). Plaintiff has a high school education and previous work experience as a truck driver, material handler, and most recently, a letter carrier. (Tr. 808, 1136-39). In disability reports, Plaintiff reported there were days where he felt little interest or pleasure in doing things. (Tr. 1324). He also felt frustrated, had anger issues, slept too much, and was not motivated. (Tr. 1595, 1402, 1404). Plaintiff stated he had no friends and the only person he talked to was his father. (Tr. 931). He was capable of driving and doing yardwork. (Tr. 913). Plaintiff testified he tried to help his disabled wife as much as he could; in addition, he was responsible for household chores such as running to the store. (Tr. 912, 1644).

*Medical Evidence*

Physical Impairments

Plaintiff had medical records demonstrating treatment for right knee pain which resulted in diagnoses of a right knee sprain, contusion, meniscal tear, and osteochondritis dissecans. (Tr. 1177, 1184, 1198, 1226). On April 26, 2005, Plaintiff underwent a right knee arthroscopy, lateral meniscal repair, and surgery for the osteochondritis dissecans. On May 29, 2009, he underwent another arthroscopy related to his legs. (Tr. 1233, 1238). Medical records from a December 28, 2010 examination, indicate Plaintiff's pain level was five on a ten-point scale, and he had mild quadriceps atrophy, moderate crepitation in the knee, mild tenderness in the lateral joint line with

equivocal Appley's test, and moderate antalgic gait. (Tr. 1270). Plaintiff was not allowed to return to his work as a letter carrier as a result of this examination. (Tr. 1280).

On April 4, 2011, Plaintiff, saw Dr. James Martin, for the first time since 2006 and he diagnosed Plaintiff with chronic right knee pain secondary to previous diagnoses of knee contusion, sprain, and osteochondritis dissecans with associated depression. (Tr. 1444). Plaintiff's osteochondritis dissecans was reaffirmed on May 5, 2011 and November 3, 2011. (Tr. 1440, 1443, 1447).

In January 2012, state agency physician, Paul Morton, M.D., opined Plaintiff could perform a full range of light work except that he could only occasionally kneel, crawl, or climb ladders, ropes, scaffolds; and could frequently balance, stoop, and crouch. (Tr. 998-99, 977-78).

Consultative examiner, Dr. Christina Feser, examined Plaintiff on January 7, 2012, and reported Plaintiff's typical daily activities consisted of doing things around the house. (Tr. 1450). Plaintiff was reported to be intact neurologically, had normal reflexes, and a normal cardiovascular system. (1452-53). Further, Plaintiff had trace edema in both legs, mild swelling of the right knee with tenderness to light touch, and mild tenderness to palpitation in his lower thoracic and lumbar spine. (Tr. 1452-53). He was found to be in no acute distress and his range of motion was fully intact with the exception of the right knee. (Tr. 1451-57). She opined Plaintiff could sit for a normal eight-hour workday with mild limitations and did not need an assistive device for short or long distance walking. (Tr. 1454).

In a follow exam up with Dr. Martin on February 7, 2012, Plaintiff complained of knee pain and reported actions like squatting, kneeling, and stepping were bothersome. (Tr. 1569). Examination revealed mild soft tissue swelling at the lateral right knee joint with tenderness to palpitation in this region, and 1+ pitting edema of the right lower extremity below the knee; he

was diagnosed with osteochondritis dissecans and was given a Juzo knee high compression stocking for his right leg. (Tr. 1596). On March 5, 2012, Plaintiff said his primary care provider assessed him with right knee pain and secondary degenerative changes. (Tr. 1612).

Dr. Martin performed a physical RFC assessment on July 23, 2012, where he limited Plaintiff to lifting fifteen pounds occasionally and ten pounds frequently due to chronic right knee pain with intermittent spontaneous buckling of the knee resulting in a risk of falling. (Tr. 1702). Additionally, Plaintiff's standing/walking was limited to two hours out of an eight hour day; climbing, balancing, stooping, crouching, kneeling, crawling, pushing, and pulling were limited to rare/none; handling, and gross manipulation were limited to occasional; and Plaintiff must avoid heights, moving machinery, and environmental extremes such as high and low temperatures. (Tr. 1702-1703). Plaintiff was prescribed a cane, brace, and a TENS unit in addition to needing additional rest breaks. (Tr. 1703).

Mental Impairments

Plaintiff saw Horia Cracium, M.D., on January 18, 2010, where he was assessed a Global Assessment of Functioning (GAF) score of 75.[1] (Tr. 1504). Plaintiff saw Dr. Cracium again on December 3, 2010, at this appointment he had increased anger, depression, improper grooming, and was anxious. (Tr. 1249). Dr. Cracium diagnosed major depression and assigned a GAF score of 65.[2] (Tr. 1248-49).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 71-80 reflects that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupation, or school functioning (e.g., temporarily falling behind in school work). *DSM-IV-TR*, at 34.
2. A GAF score of 61-70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional

4

Plaintiff saw a primary care physician at the VA on February 8, 2011, and reported having little interest in doing things, trouble staying/falling asleep, feeling tired and lethargic, a poor appetite, feeling like a failure, and struggling to concentrate. (Tr. 1324). These symptoms were suggestive of moderate depression on a mental health screening. (Tr. 1324). On February 24, 2011, Plaintiff underwent an initial psychiatric assessment at the VA. (Tr. 1301). He was diagnosed with major depression and alcohol dependence by history and assigned a GAF score of 45.[3] (Tr. 1303).

From March 23, 2011 to November 23, 2012, Plaintiff reported a litany of issues such as being irritable, angry, anxious, depressed, having poor insight and judgment, having an unstable mood, being unkempt and disheveled, feeling overwhelmed, having panic attacks, isolation issues, and poor frustration tolerance. (Tr. 1382-83, 1388-90, 1393, 1398, 1402, 1406 1410, 1415, 1417, 1421, 1423, 1435, 1589-91, 1595, 1601, 1604, 1606, 1619, 1621, 1623, 1696, 1729, 1736, 1737-38, 1741, 1745-46). Plaintiff also reported stealing money from birthday cards, for which he was subsequently fired and prosecuted; as well as gambling, being impulsive, having verbal confrontations with his neighbor, and swearing at his wife. (Tr. 1423, 1432). Plaintiff's diagnoses were personality disorder, dysthymic disorder, and opioid dependence and his GAF scores hovered around 50. (Tr. 1381, 1383-84, 1387, 1390-91, 1394, 1399, 1407, 1411, 1418, 1424, 1427, 1433, 1591, 1595-96, 1604-05, 1624, 1711, 1722, 1738, 1742).

Plaintiff saw psychiatrist Catherine Nageotte M.D., in April 2011, reporting that he could not work because he could not be around people. (Tr. 1426, 1673). Dr. Nageotte noted that being

---

truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV-TR*, at 34.
3. A GAF score of 41-50 reflects serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34

able to work around people and managing his annoyance with others was an achievable goal for Plaintiff. (Tr. 1426, 1673). In November 2011, Plaintiff suggested to a social worker that he might want to detox at a local treatment facility and said he had concerns over his addiction and his feelings about deceiving others. (Tr. 1628). Ingrid Barcelona, CNP, continued to diagnose opioid dependence. (Tr. 1604).

On May 5, 2011, state agency psychologist Paul Tangerman, Ph.D., reviewed Plaintiff's medical records and opined Plaintiff could perform simple repetitive tasks where there was no contact with the public and only superficial, infrequent interaction with coworkers; and could perform tasks in which the changes were infrequent and could be easily explained. (Tr. 957-58).

In April 2012, Ms. Barcelona reported Plaintiff was doing fair and was clean, neat, cooperative, polite, had good eye contact, no abnormal motor movements, a normal rate of speech, no delusions or hallucinations, his thought process was coherent, logical, and goal directed, and his insight and judgment were fair; yet she reported Plaintiff felt helpless. (Tr. 1594-95). However, when Plaintiff saw Ms. Barcelona again in June 2012, he was unkempt and disheveled with notable body odor. (Tr. 1590). Plaintiff continued to be cooperative and polite with good eye contact, normal motor movements, but with an anxious and depressed mood and a blunted affect. (Tr. 1590-91).

Ms. Barcelona completed a mental medical source statement on June 19, 2012. (Tr. 1575). She opined Plaintiff had a poor ability to follow work rules; use judgment; maintain attention and concentration for extended periods; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerances; deal with the public; relate to coworkers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted

and distracting; deal with work stresses; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; maintain appearance; socialize; relate predictably in social situations; manage funds/schedules; leave home on his own; and understand, remember, or carry out complex job tasks. (Tr. 1575-76).

After the Hearing

Medical records submitted subsequent to the hearing included a record from the VA from January 18, 2013, where Plaintiff felt depressed, irritable, and described panic attacks. He was diagnosed with dysthymia, opioid dependence, tobacco dependence, and mixed personality disorder. (Tr. 734-35).

Medical records were also submitted from MetroHealth Medical Center where Plaintiff went to the emergency room on January 30, 2013, with symptoms of stuttering and having difficulty making words. His wife brought Plaintiff in after he became more agitated and combative throughout the day. (Tr. 820). A CT scan of the head revealed mild cortical atrophy. (Tr. 870).  Plaintiff was subsequently hospitalized from January 31 to February 4, 2013 after these symptoms were diagnosed as meningitis. (Tr. 587-88).

On February 6, 2013, Plaintiff enrolled himself in a two-week inpatient detox facility for the purpose of getting off of Oxycontin. (Tr. 737). Plaintiff spent March 6 to March 12, 2013 at Stella Maris and was diagnosed with opioid dependence, opioid withdrawal, nicotine dependence, bipolar I disorder, and depression; he was assigned a GAF score of 41; Plaintiff successfully completely the program. (Tr. 741, 744, 790).

There are also records from ongoing visits to the VA regarding Plaintiff's psychiatric state. From March 5 to April 16, 2013, Plaintiff reported that he could not do anything, was not

motivated, and was unable to commit or make decisions. (Tr. 545). He was diagnosed with dysthymia, opioid dependence, tobacco dependence, and mixed personality disorder. (Tr. 546, 562).

Plaintiff was hospitalized May 9 to May 15, 2013, for suicidal thoughts, planning to take his own life by carbon monoxide poisoning, admitting to taking left-over oxycontin, as well as having been subject to many weeks of poor sleep, appetite, energy, and motivation (Tr. 280, 365). During this time period, Plaintiff was diagnosed with dysthymic personality disorder, substance use disorder, nicotine dependence, opioid dependence, hyperlipidemia, chronic obstructive pulmonary disease, chronic knee pain, and diarrhea, and it was also noted that Plaintiff was non-compliant with treatment. (Tr. 423, 425-26, 463, 494-95).  While enrolled at a VA interdisciplinary treatment facility from May 15 through July 3, 2013, Plaintiff worked on anger management skills, grief coping, and rebuilding relationships with his wife and father. (Tr. 147). Through March 5, 2014, there were consistent reports of problems with sleep, motivation, and bathing, and that he was hopeless and disheveled. (Tr. 25, 59).

On November 20, 2013, Dr. Castro completed a medical source statement opining Plaintiff rarely had the ability to use judgment to function independently without redirection, maintain appearance, manage funds/schedules, leave home on his own, and understand, remember or carry out simple job instructions. (Tr. 572-73).

*VE and ALJ Decision*

The vocational expert ("VE"), testified at the hearing. (Tr. 932). The ALJ asked the VE in a hypothetical to consider a person of the same age, education, and past work, who could occasionally lift twenty pounds and frequently lift ten pounds; could stand and walk six hours of an eight hour work day; would have unlimited ability to push and pull; could occasionally climb

8

ladders, ropes or scaffolds; could frequently balance, stoop and crouch, and could occasionally kneel and crawl; and was limited to simple, routine tasks with only occasional, superficial interaction with co-workers and supervisors, no interaction with the general public, and infrequent changes. (Tr. 934). The VE opined that such a person could not perform Plaintiff's past work but could perform work as an electronics worker, wire worker, or bench hand. (Tr. 934-35).

Next, the ALJ gave the VE a hypothetical question where the individual was able to perform simple, routine tasks or unskilled work in which there is occasional superficial interaction with coworkers, and supervisors and no contact with the general public and tasks in which the changes are infrequent and can be explained. (Tr. 934). The VE responded Plaintiff could not perform his past relevant work, but did state Plaintiff could do light, and sedentary unskilled type work like a wire worker, an electronics worker, and a bench hand. (Tr. 935). The ALJ added another limitation to the hypothetical where the individual is off-task for fifteen percent of the time due to problems with depression; the VE responded that there would be no jobs because it would be unacceptable in a competitive setting. (Tr. 936).

The ALJ found the claimant had severe impairments of degenerative joint disease, depressive disorder (bipolar disorder), personality disorder, dysthymic disorder, and substance addiction disorder. (Tr. 801). Next, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 20 C.F.R. §§ 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926. (Tr. 801, 809). Then, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that he could occasionally lift twenty pounds and frequently lift ten pounds,

could stand and walk six hours of an eight hour workday, could sit for six hours out of an eight hour workday, had unlimited ability to push/pull, occasionally climb ladders, ropes and scaffolds, frequently balance, stoop, and crouch and could occasionally kneel and crawl. (Tr. 803). The ALJ found that jobs exist in significant numbers in the national economy that Plaintiff could perform; therefore, he was not disabled. (Tr. 808).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 20 C.F.R. § 416.905(a); see also 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520– to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff contends the ALJ erred by not affording Dr. Martin's opinion controlling weight, and by not properly considering a medical source statement completed by Ingrid Barcelona, CNP. (Doc. 17, at 11, 15). Plaintiff also contends the evidence submitted subsequent to the

11

hearing, is new and material such that it warrants remand pursuant to Sentence Six. (Doc. 17, at 18).

*Treating Physician Rule*

Plaintiff argues the limitations Dr. Martin gave should have been given controlling weight. (Doc. 17, at 11-15). The ALJ reasoned the medical records are more consistent with light residual functional capacity, and therefore, were not consistent with Dr. Martin's limitations. (Tr. 807).

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical

12

signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409B10 (6th Cir. 2009).

The ALJ addressed Dr. Martin's opinion as follows:

> On July 23, 2012, Dr. James Martin, submitted a medical source statement on behalf of the claimant. Dr. Martin opined that the claimant has the residual functional capacity to perform sedentary work (Exhibit 18F). The undersigned gives this opinion little weight, as the medical records, which are more consistent with the light residual functional capacity given at the hearing, do not support it. The undersigned further notes that this medical source statement was provided after the hearing.

(Tr. 807). Thus, the ALJ found Dr. Martin's opinion should be given little weight because it was inconsistent with the record. (Tr. 807).

While an ALJ is not required to provide "an exhaustive factor-by-factor" analysis when weighing an opinion, *Blakely*, 581 F.3d 399, 409-10 (6th Cir. 2009); she is required to provide enough explanation to adequately explain to the claimant the decision being made. *Ealy,* 594 F.3d at 514. This is required even where the conclusion of the ALJ may be justified on the record as a whole. By no means is an ALJ required to repeat every piece of evidence considered in making their determination, especially where it has been summarized elsewhere in the opinion. But the ALJ is required to identify and explain those pieces of evidence which support discounting a treating physician's opinion. *See Rogers,* 486 F.3d at 243.

13

Here, the ALJ did not adequately identify or explain the evidence that supported her decision. Instead, she provided a single conclusory statement, which is inadequate to satisfy the good reasons requirement. Her summary of the medical records earlier in the opinion included evidence which could support her conclusion that the objective evidence was inconsistent with Dr. Martin's opinion; but she failed to cite to this evidence in her reasoning. (Tr. 804-07). For example, the ALJ noted Plaintiff had continued to receive only infrequent and conservative treatment for knee pain since his arthroscopy in 2008. (Tr. 805, 1569). She also discussed that Plaintiff only had mild tenderness in his lumbar spine, had normal reflexes, had been able to fully squat with no assistance, and had an intact range of motion except for in his right knee. (Tr. 805).

However, the Court is not allowed to engage in *post-hoc* rationalizations of the medical evidence to support an ALJ's reasoning, and that is what would be required here to affirm the ALJ's conclusion. Good reasons are required so as to "permit[ ] meaningful review of the ALJ's application of the rule." *Wilson,* 378 F.3d at 544. In this instance meaningful review could not take place, and thus any conclusion to the contrary would involve improper rationalizations. As such, remand is required for the ALJ to more fully explain the weight given to the treating physician's opinion.

*Other Source Opinion*

Plaintiff further alleges the ALJ erred in her analysis of Ms. Barcelona's opinion. The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues

such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

Here, Ms. Barcelona is a nurse practitioner, which does not qualify as an "acceptable medical source". Because she is not an acceptable medical source, the ALJ is vested with the discretion to determine the proper weight assigned to these sources based on the evidence of record. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). The ALJ is not required to discuss all of the evidence that is submitted and does not need to explicitly explain everything in order to show that it was considered. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

Ms. Barcelona filled out a medical source statement listing Plaintiff's ability to perform functions as poor except for his ability to behave in an emotionally stable manner, which she

15

opined was fair. (Tr. 1575-76). The ALJ concluded this was inconsistent with the medical records. (Tr. 806-07). In her opinion the ALJ referenced Dr. Cracium's appointment notes, she had assigned Plaintiff a GAF score of 65 at one appointment, and a GAF score of 75 at another appointment which means that his symptoms improved from mild to slight impairment. (Tr. 806, 1503-04). This is inconsistent with Ms. Barcelona's GAF rating which was consistently a score of 50. (Tr. 807, 1647). The ALJ also cites Dr. Nageotte who believed that working around people and managing his annoyance with others was an achievable goal for the Plaintiff. (Tr. 806). Further, the ALJ noted activities of daily living which contradicted Plaintiff's claims of inactivity. (Tr. 806).

The regulations do not require an express analysis of Ms. Barcelona's opinion; nonetheless the ALJ noted that Ms. Barcelona's opinion was inconsistent with the evidence of record and provided examples for the aforementioned decision. Therefore, Plaintiff's second assignment of error is not well-taken.

*Sentence Six Remand*

Lastly, Plaintiff argues the evidence submitted to the ALJ after the hearing is new and material and thus remand is necessary for further consideration of this evidence under Sentence Six. (Doc. 17, at 18).

Under sentence six of 42 U.S.C. § 405(g), the district court does not affirm, modify, or reverse the Commissioner's decision; it does not rule in any way as to the correctness of the administrative determination. *Melkonyan v. Sullivan*, 501 U.S. 89 (1991); *Cross v. Comm'r of Soc. Sec.,* 373 F. Supp. 2d 724, 734 (N.D. Ohio 2005) ("'Sentence six' of 42 U.S.C. § 405(g) permits a reviewing court to remand, without ruling on the merits"); *see also, Anthony v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 180708, at *6-8 (N.D. Ohio 2013). If a sentence six

remand is ordered, the district court retains jurisdiction while the matter is remanded to the social security administration for further proceedings; it is not a final judgment that can be appealed. *Melkonyan*, 501 U.S. 89; Cross, 373 F. Supp. 2d 724; *Wasik v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 18106 (E.D. Mich. 2011).

A claimant must establish two prerequisites before a district court may order a Sentence Six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2001). A claimant must show: (1) the evidence at issue is both "new" and "material"; and (2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). The party seeking remand bears the burdens of showing these two requirements are met. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Here, none of the evidence submitted is material. Regarding the January 2013 hospitalization for meningitis, there nothing to suggest knowledge of this condition would have altered the ALJ's decision regarding the Plaintiff's ability to engage in sustained work activity. Plaintiff stated that these symptoms were "sudden," and that they were resolved within a few weeks. This does not meet the threshold for severe impairments, and as a result this evidence would not be considered material, and therefore does not warrant a remand. Similarly, Dr. Castro's November 2013 opinion is likewise not material. It was made nearly a year after the ALJ's decision was rendered and thus it is difficult for this Court to conclude it bore any relation to Plaintiff's condition during the relevant time period. (Tr. 572-73). Furthermore, Plaintiff has provided no justification for why Dr. Castro's opinion was not secured prior to the hearing, considering Plaintiff had been under his care since January 2012, well before the ALJ hearing.

(Tr. 573). *See Foster,* 279 F.3d at 357 ("A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence before the ALJ.").

Lastly, Plaintiff's hospitalizations for his Oxycontin detoxification in March 2013 and his suicidal thoughts in May 2013, also clearly occurred after the ALJ's decision. (Tr. 280, 365). Although Plaintiff argues this hospitalization reflects back to the relevant time period, he is unable to argue that the ALJ's decision would have been changed by this evidence because it is impossible to conclusively determine that this was the result of delayed treatment rather than a sudden onset of worsening symptoms. More importantly, drug dependence cannot be a contributing factor to a person's disability in order for him to receive benefits; thus the hospitalizations weigh against finding Plaintiff disabled. 42 U.S.C. § 423(d)2(C) Therefore, Plaintiff has not shown that remand is warranted under Sentence Six.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB benefits is supported, in part, by substantial evidence. As discussed above, remand is required to clarify the reasons why Dr. Martin's opinion is not entitled to controlling weight. Plaintiff's other assignments of error are overruled. Accordingly, the Commissioner's decision is affirmed in part and remanded in part.

s/James R. Knepp II<br>United States Magistrate Judge